# Testimony Regarding the Evaluation of Brero Construction's Schedule Performance, Damages and Loss of Productivity Claims Relating to the Construction of the San Jose Job Corps Center

**Prepared by:**

**John H. McTyre**
**of**
**Construction Dispute Resolution & Support Services Inc.**

**Court of Federal Claims**
**No. 00-775**

**April 28, 2006**

**State Your Name and Address.**

My name is John Holland McTyre. My address is 3700 Van Ness St. NW, Washington, DC 20016.

**Describe your educational background.**

I graduated from Swarthmore College in 1975 with Bachelor of Arts in Spanish Literature and a Bachelor of Science in Civil Engineering.

I graduated from Stanford University in 1979 with a Master of Science in Civil Engineering – Construction Management.

**Describe your work experience.**

From 1979 to 1980 I worked for Turner Construction Company at the National Institutes of Health in Bethesda, Maryland. I was assigned to the Ambulatory Care Research Facility Project as an Office Engineer and then as an Assistant Superintendent. Initially I was responsible for coordinating shop drawings, processing change orders and creating a recovery schedule and then I was responsible for coordinating the field activities of trades such as concrete and structural steel.

From 1980 to 1987 I worked on three projects for Gilbane Building Company in the Washington Metropolitan Area. I was initially assigned to the Pennsylvania Avenue Development Corporation Project as a Senior Office Engineer, where I processed shop drawings, reviewed contractor's schedules, processed change orders/claims and conducted design reviews. Then I was assigned to the Torpedo Factory Project as a Project Engineer and then as a Senior Project Engineer. My responsibilities at the Torpedo Factory included processing shop drawings and changes/claims, creating and maintaining the project schedule and the cost control system. After the Torpedo Factory I started and ran Gilbane's Interior Construction Department for the Mid Atlantic Division as a Project Manager. I was responsible for all aspects of multiple small projects including scheduling and cost.

From 1987 to 1990 I worked as an Owner's Representative for Prudential Realty on an office complex in Fairfax, Virginia. I was responsible for maintaining the progress of and coordinating all construction at the office complex including an office building, tenant work, parking structure and design for future work. I was also responsible for processing change orders and claims and quality control.

From 1990 to 1995 I was a Senior Associate at Brower and Associates, where I was responsible for preparing and analyzing several aspects of construction claims related to delays and damages.

From 1995 to 2005 I worked for Warner Construction Consultants where I continued to prepare and analyze construction claims and I started managing larger assignments, such as the delay analysis of the Hong Kong Airport, the Bolivia-Brazil Natural Gas Pipeline Project, an LNG Plant in Malaysia, refineries, power plants and several institutional facilities. I started as a Senior Consultant and was eventually promoted to Vice President.

While at Warner, I worked on several Job Corps Projects, including Charleston, Memphis, Hartford, San Diego, San Francisco, Chicago, etc.

I am currently a partner at Construction Dispute Resolution & Support Services, where I continue to prepare and analyze construction claims and also provide contemporaneous claims avoidance services.

**Have you testified as an expert?**

Yes I testified as an expert on the following matters:

- Trafalgar House Construction v. United States Department of Justice (2005) – schedule analysis and damages

- Hirschfeld Steel Company v. Kellogg Brown and Root (2004) – qualified as an expert in scheduling
- Trafalgar House Construction v. ZMM, DMJM, et al (2001) – schedule analysis and standard of care of a Program Manager
- HCE Inc. v. Park Center III Limited Partnership (2001 – Arbitration) – schedule analysis and status of construction at time of termination
- Beiman Rowell Mechanical Construction Co. v. Donohoe Construction Co. (1999) – schedule analysis, inefficiency analysis and damages
- Centex-Rooney v. Metro-Dade County (1993) – cost and entitlement of extra work
- Gilbane Building Company v. A. A. Beiro Construction Company (1989 Arbitration) – schedule analysis and fact witness
- Gilbane Building Company v. Alexandria Waterfront Restoration Group (1988 Arbitration) – schedule analysis and fact witness

In addition, my expert report was used by the court in lieu of expert testimony in Wu Construction Co. v. Untied States Department of Labor (2005) – schedule analysis

**Have you participated in mediations?**

Yes I have made presentations/participated at the following mediations:

- Lawrence Brunoli Inc. v. United States Department of Labor (2006) – schedule analysis and damages
- Trafalgar House Construction v. United States Department of Justice (2005) – schedule analysis and damages
- Big Sky General Contractor, Inc. v. United States Department of Labor (2005) – schedule analysis and damages
- Harold West & Sons Construction Company v. United States Department of Labor (2005) – schedule analysis and damages
- Warren Electric Company Inc. v. GSA (2003) schedule analysis, inefficiency and damages
- Zellner Construction Co. v. United States Department of Labor (2002) – schedule analysis
- BCJ (British Chinese Japanese) Joint Venture v. Hong Kong Airport Authority – (2001) – schedule analysis
- Centex-Bateson Construction Co. v. Department of the Navy (2000) – schedule analysis

**Do you teach or lecture on construction related matters?**

I have been teaching a graduate level course at Catholic University of America entitled Construction Scheduling Techniques since 2002.

I have presented seminars for continuing education credit (sponsored by Lorman educational Services) on the following topics:

- 'Construction Delay Claims'
- 'Tricks Traps and Ploys used in Construction Scheduling'
- 'Managing Construction Projects in Maryland'
- 'Construction Claims in Maryland'

I was a moderator for two sessions of the Construction Super Conference (San Francisco - 2002 and 2003) and once at the Global Construction Super Conference (London – 2004).

I also presented seminars for the Associated Builders and Contractor's Project Management Academy.

**Do you have any current certifications related to construction?**

Yes, I am a certified Planning and Scheduling Professional (certified by the Association for the Advancement of Cost Engineers).

**Describe your involvement in the San Jose Job Corps Project**

In early 1999 McKissack & McKissack, the Program Manager for the Department of Labor asked me to analyze the Time Impact Analysis and the Revised Quantum that were submitted on behalf of Brero Construction Inc. (Brero or "the Contractor") in late 1998 that involved the construction/renovation of certain buildings at the San Jose Job Corp Center. On May 24, 1999 I submitted a preliminary evaluation of the two referenced documents.

In late 1999 McKissack & McKissack asked me to add to my evaluation the Loss of Productivity Analysis and Change Order Proposal (COP) No. 170 (both dated

September 20, 1999) that were submitted on behalf of Brero. I expanded my evaluation to include the two referenced documents and prepared a preliminary report on December 1, 1999.

Since issuance of the December 1, 1999 report, I have not prepared any other reports other than the current one.

**Summarize your opinions as of today.**

Opinion regarding time extensions:

- Based on an evaluation of Brero's Time Impact Analysis of October 9, 1998 ('Brero's TIA'), it is my opinion that the Contractor is not entitled to time extensions in addition to those that have been granted through Contract Modification No. 12.

Opinion regarding extended performance costs:

- It is my opinion that Brero is not entitled to extended performance costs as claimed in Change Order Proposal No. 170 KM (Final) dated September 20, 1999 (COP 170).
- Based on an evaluation of Brero's TIA, it is my opinion that the contractor is liable for 39 days of liquidated damages, or $9,165 (39 x $235).

Opinion regarding loss of productivity costs:

- It is my opinion that because Brero's analysis (Loss of Productivity Analysis (Final) dated September 20, 1999) does not demonstrate that the Brero incurred loss of productivity due to actions or inactions of the Department of Labor, they are not entitled to the costs claimed ($697,827)

**What documents did you review to form your opinions?**

The following documents were reviewed:

- Time Impact Analysis - October 9, 1998
- Revised Quantum - December 22, 1998
- Loss of Productivity Analysis (Final) – September 20, 1999
- Proposed Change Order No 170 (Final) – September 20, 1999
- Three sets of undated 11x17 charts that were allegedly produced in late 1999
  - 48 sheets of Time Impact Trends (February 1993 – November 1994)
  - 26 sheets of Loss of Productivity Charts
  - 3 sheets of Summary Time and Loss of Productivity
- As available at McKissack & McKissack's office:
  - Project correspondence
  - Project schedules
  - Certified payrolls
  - Applications for payment
- Contract Modifications
- Construction Specifications and Drawings
- Conversations with Troy Caperton

**How did you arrive at your opinion regarding compensable delays?**

The contract required Brero to achieve substantial completion of the Project within 490 days of receipt of Notice to Proceed (NTP). NTP was issued by the Government on February 1, 1993.

It is not clear when Brero actually received the NTP, but Brero's Time Impact Analysis (TIA) is based on the schedule that was used contemporaneously, which shows work commencing on February 4, 1993. Brero's TIA also shows that work was required to be substantially completed by June 8, 1994.

Because the TIA baseline schedule is based on the schedule that was used contemporaneously, which appears to be substantially in compliance with the contract requirements, the June 8, 1994 date for substantial completion will be accepted for evaluation of Brero's TIA.

Brero's TIA measures delay from June 8 to November 17, 1994, or 162 days. Brero claims that all 162 days are excusable compensable (reference COP 170).

There are significant flaws with Brero's claim of entitlement to 162 days of compensable delay which are listed below:

- Project Substantial Completion was achieved on October 18, 1994. November 7, 1994 has previously been identified as the date of substantial completion, however, the inspection that acknowledged that substantial completion had been achieved was conducted on October 17 and 18. At the conclusion of that inspection, it was agreed that the project had achieved substantial completion (reference slides 5 and 7).
- Contract Modification Nos. 6 and 8 granted time extensions to September 9, 1994. Modification No. 6 granted a one day time extension. Modification No. 8 granted a 90 day time extension for adverse weather and specified that project substantial completion was changed to September 9, 1994 (reference slide 11 and 13). Contract Modification No. 8 was executed by the parties contemporaneously, during the performance of the Project, and should therefore be afforded more weight than a forensic study which was subsequently prepared by individuals who had no personal knowledge of the causes and conditions that resulted in the delays.

  Project delays caused by adverse weather are non-compensable and accordingly, no compensation was included in Modification No. 8.

Based on the above, the only period to consider for an excusable time extension is from September 9, 1994 to October 18, 1994, or 39 days.

According to Brero's TIA, the issues that caused delay for the period from September 9, 1994 to October 18, 1994 were the following:

- COP 192 – Provide 6x8 concrete walk **(1 day – September 9 to September 10, 1994)**
- Contractor extended performance of contract work – inexcusable **(19 days – September 10 to September 29, 1994)**

- COP 209 – Additional Soil Amendment **(1 day – September 29 to October 8, 1994)**
- COP 234 – Screens over wall louvers **(10 days – October 8 to October 18, 1994)**

According to Brero's TIA, the above accounts for all delays from September 9, 1994 to October 18, 1994.

COPs 192, 209 and 234 were all listed on page 4 of Contract Modification No. 11. According to Contract Modification No. 11, Brero is not entitled to any further adjustments to the contract for work associated with COPs listed on pages 3 and 4 of the Modification (reference slides 16, 17 and 18).

**Are there any inconsistencies with Brero's TIA other than those already mentioned?**

Yes. For example, even if Brero had not agreed that it had received full compensation and contractual adjustments for the three COPs that, according to the Analysis, affected substantial completion between September 9, 1994 and October 18, 1994, Brero's TIA confirms that the three COPs would not have actually caused a delay to substantial completion. COPs 192 and 209 impact the projected substantial completion date because they restrain the timely completion of the 'phase 2 landscaping.' However, Brero's TIA shows that substantial completion was granted prior to the completion of the phase 2 landscaping, so the two one day delays to the start of landscaping actually had no impact on substantial completion.

Also, according to Brero's TIA, COP 234 was not completed until after substantial completion, so it too was not an impediment to substantial completion.

Other inconsistencies in Brero's TIA include unjustified assignment of responsibility. For example, according to Brero's TIA, COP 226, installation of two lights in a storage room in Building F, caused 11 days of Project delay, which Brero claims was the responsibility of the Department of Labor. Brero's backup for the TIA indicates that the Department of Labor directed Brero to install the lights on September 8, 1994. According to the Analysis, the change was performed in one day, November 15, 1994. There is no documentation in the Analysis that indicates that the lights were a long lead item or that there was any other justification for the Contractor to take more than two

months to perform such a minor change. Yet the TIA indicates the change caused 11 days of critical delay and that the Department of Labor is responsible for the delay.

The Analysis also does not demonstrate that Brero provided notice to the Department of Labor, in accordance with the Contract, that the extra work required by COP 226 would cause a critical delay to the Project. If proper and timely notice had been provided, the Department of Labor would certainly have considered alternative means of having the lights installed in the storage room.

It is unreasonable to assign responsibility for the alleged critical delay caused by COP 226 to the Department of Labor for the following reasons:

- The extra work was not performed promptly by the Contractor – more than two months of unexplained non-performance; and
- The Department of Labor was not notified that the extra work would result in a critical delay.

**How did you arrive at your opinion regarding extended performance costs?**

Based on the evaluation of Brero's TIA, the Contractor is not entitled to compensable time extensions and is therefore not entitled to extended performance costs.

**Did you review the extended performance costs and if so did you analyze them to determine if they were reasonable?**

Yes, I did review the extended performance costs and found that costs were included that should not have been included. Brero's extended performance costs are shown on COP 170 and are broken down into two components: (1) extended general conditions costs and (2) extended home office overhead costs. Both components are addressed below:

*Extended General Conditions Costs:*

Below is a list of costs that were included in Brero's claim for extended general conditions, as shown on COP 170, which if they were entitled to extended general conditions, should not have been included:

- Extended general conditions costs were included in Brero's COP 170 that were incurred after substantial completion (October 18, 1994). These costs should not be included in the calculations for extended general conditions because those costs would have been incurred even if there had been no delay.
- COP 170 includes cost categories that are not time dependant and should therefore not increase due to a delay. Test/Inspection costs, $9,697 ($5,415 plus markup) should not be included because such costs would be incurred even if the Project was not delayed.
- COP 170 includes categories that incur costs at a disproportionately higher rate during the period identified in the claim. The claim included all cleanup costs from June 6, 1994 to July 25 1995. Cleanup costs are incurred at a disproportionately high rate during the end of a project because it includes the cost of 'final' clean up. According to the data provided, more than 50 % of the costs were incurred during the last 25 % of the project duration.

A more commonly accepted method of calculating extended general conditions costs is to calculate a daily rate for time sensitive cost categories (actual general conditions costs for the entire project divided by the number of days of performance). The daily rate is then multiplied by the number of days of compensable delay to produce the extended general conditions costs. With the data provided in COP 170 the correct daily rate would be calculated as follows:

General conditions costs incurred from the beginning of the project (February 4, 1993) until June 13, 1994 (to exclude final cleanup costs) as shown on Brero's "Job Cost-To-Date Report":

| | |
|---|---|
| Supervision/Foreman (w/ 48% burden) | $117,623 |
| Utilities L (w/ 48% burden) | 1,622 |
| Utilities M | 7,025 |
| Job Expense L (w/ 48% burden) | 4,370 |
| Job Expense M | 43,483 |
| Job Clean Up L (w/ 48% burden) | 10,071 |
| Job Clean Up M | 2,845 |
| Tools and Equipment | 16,817 |
| Rental Equipment | 14,885 |

| | |
|---|---|
| Temporary Fence (w/ 48% burden) | 1,530 |
| Scheduling | 5,052 |
| Total | $225,323 |

Period: 494 days

Rate: $225,323/494 = $456

A fair and reasonable rate for extended general conditions is $456 per day of compensable delay.

*Extended Home Office Overhead Costs:*

Brero executed a contract modifications that includes all cost for all delays except 39 days. Brero executed another contract modification that includes all costs for the COPs that their TIA analysis shows caused the delays that were not self-imposed. Brero has not shown that any other COPs or contract changes caused critical delays. If other changes had caused delays, then Brero would be entitled to extended home office overhead only to the extent that it is included in the markup allowed under the contract. Extended home office overhead would only by permitted as a separate calculation if the government caused the Contractor to suspend its work (and other criteria). There is no documentation provided by Brero that the Department of Labor caused a suspension of work for which they would be entitled to extended home office overhead costs.

**How did you arrive at your opinion regarding assessment of Liquidated Damages?**

Based on the evaluation of Brero's TIA, the Contractor is responsible for 39 days of Liquidated Damages. According to the Contract, liquidated damages are to be assessed in the amount of $235 per day of inexcusable delay (reference slide 20 and 22). The amount of $9,165 is obtained by multiplying 39 times $235.

**How did you arrive at your opinion regarding Brero's claim for loss of productivity?**

Brero's Loss of Productivity Analysis (Final) dated September 20, 1999 (LOP Analysis) does not demonstrate that the Department of Labor was responsible for Brero's

alleged loss of productivity for two reasons. First, the alleged cause of the loss of productivity, is not clearly identified and a cause/effect relationship is not established. Second there are significant inconsistencies in the methodology.

- **Causation Not Identified:**

  Brero's LOP Analysis measured inefficiency in framing activities every month by building and then selected the best performance (in this case Bldg L1 during December 1993 and January 1994) and assumed (by attributing all inefficiency costs to the Department of Labor) that all performance other than during the 'clean period' was worse only because of actions or inactions of the Department of Labor.

  For a study such as this to conclude that all loss of efficiency is the fault of impacts caused by the Department of Labor, it is necessary to demonstrate the following:

  - all impacts that could result in a variation in the productivity other than those caused by the Department of Labor were consistent during the entire performance of the framing activities; and
  - that impacts caused by the Department of Labor were relatively nonexistent or significantly less during the 'clean period' than during the balance of the framing.

  No effort was made to demonstrate that impacts not caused by the Department of Labor were consistent throughout the framing nor that the Department of Labor caused impacts were relatively nonexistent during the 'clean period.'

  Examples of impacts other than those caused by the Department of Labor that could have affected the productivity include the following:

  (1) weather – work in the warmer months of July and August would result in lower productivity than work in December and January, during the

'clean period.' In July and August 1993 there were 11 days with temperatures 90 degrees or higher, while in December 1993 and January 1994 the temperature never exceeded 71 degrees.

(2) supervision – a difference in supervision could have resulted in a loss of productivity during periods other than the clean period

(3) bid errors – inaccuracies in the bid could result in some apparent loss of efficiencies

(4) learning curve – it is commonly accepted that tasks are performed less efficiently initially than after they are performed repeatedly. The clean period is neither at the beginning of the project framing nor at the beginning of Building L1 framing.

Brero's LOP Analysis does not demonstrate that the above factors and all other non Department of Labor caused impacts to framing productivity were adequately accounted for in the study.

Brero's LOP Analysis states that it is 'based on LOP fragnets… derived from the TIA schedules' (page 2). There is no apparent relationship between the fragnets in the clean period and those in the balance of the framing. In fact, Brero's LOP Analysis shows significant inefficiency, more than half of the total inefficiency, occurred during months when Brero's TIA shows that no fragnets are affecting the framing (reference slide 24, 25 and 26).

There does not appear to be any relationship between the inefficiency and the fragnets and there is no other cause of inefficiency supported by the LOP Analysis.

- **Methodology Inconsistencies:**

Brero's LOP Analysis measures loss of productivity by how much longer than one hour it takes to install 36.8 units. If it takes two hours to install 36.8 units then the loss of productivity is one hour.

In theory, all units installed during each month for each building can be divided by 36.8 and the result would be the number of hours that it should have taken to install the units. This number is then compared to the actual hours worked in each building. The difference between the number of hours that it should have taken to install the units and the actual hours is inefficient hours.

In order to perform this analysis properly all of the following are necessary:

1. the actual number of units installed in each building each month;
2. the actual hours of labor spent at each building each month installing the units; and
3. all units must be the same or should require the same amount of time to install.

There is no record of the number of units actually installed each month in each building and there is no record of actual hours spent each month at each building. In addition the units being installed are so dissimilar that a reasonable comparison is not possible.

Actual Units – In the absence of the actual units installed each month at each building, Brero's LOP Analysis substituted the data from 'empirical resource curves' as indicated below (taken from page two of LOP Analysis):

> *The planned unit and labor hour resources were loaded into the Planned (February 1993) schedule. The planned distribution of these resources was defined by assigning empirical resource curves to each building. As the schedule was statused, these curves support the identification of earned value (units) for each building over time.*

Empirical resource curves will provide an estimate of how many units should have been installed if they were installed using a theoretical distribution rather than the number of units actually installed.

The empirical resource curves were significantly different from one building to the other with no explanation for the difference (reference slide 27).

Actual Labor – The LOP Analysis provides a breakdown of the actual labor hours by month and by building, however it is not clear where the data was obtained. The footnote provided on page 3 of the LOP Analysis indicates that it was obtained from the Certified Payroll and the Job Cost Report (see footnote 9 on page 3). Neither the Certified Payroll nor the Job Cost Report breaks the labor hours down by building (reference slides 28, 29 and 30).

Dissimilar Units – If the LOP Analysis had actual labor hours and actual units by month and by building, then the results would still be inaccurate because the units are significantly dissimilar.

According to the LOP Analysis, Brero's carpenters should have been able to install 36.8 trusses per hour, yet according to their bid they only planned to install 1.2 trusses per hour. Consequently if Brero's carpenters were to install 36.8 trusses in accordance with the bid, they would be inefficient in the amount of more than 43 hours. As expected, there is significant inefficiency in most instances when roof framing is in progress (reference slides 31 and 32).

Because of the significant inconsistencies in the methodology, Brero's Loss of Productivity Analysis can not be relied on to provide accurate results.

Because of the absence of a cause/effect relationship in the LOP Analysis and the inconsistencies in the methodology, the results and conclusions are invalid and inaccurate. There is no data to support that the loss of efficiency was not caused by either inefficient supervision, inefficient labor force or inaccurate estimate of the amount of time required to perform the work.

**Do you think the changes on this project were excessive?**

The Contract Modifications on this project through No. 12 increased the Contract amount $731,199 (from $8,268,000 to $8,999,199), or less than 9%. That amount of extra work on a project that involves some renovation such as this project is not excessive because some changes will be generated by concealed/unforeseen conditions. For

example, part of the 9% (contract increase) was for asbestos abatement ($18,028) which was anticipated but not included in the contract, because the extent could not be determined prior to construction.